Richard J. BOLLIG, Plaintiff,

v.

Patrick J. FIEDLER, Donald Gudmanson, Karl Brekke, Dr. Margaret Alexander, Leslie Steckbauer, Michael Zeimet, David Rutter and Jose Rodriguez, Defendants.

No. 93–C–205.

United States District Court, E.D. Wisconsin.

Sept. 21, 1994.

Richard J. Bollig, pro se.

John J. Glinski, Asst. Atty. Gen., Madison, WI, for defendants.

### DECISION AND ORDER

CURRAN, District Judge.

Richard Bollig, a prisoner in state custody, is suing eight state correctional officials and employees [1] for violating his constitutional right to due process. He seeks injunctive and monetary relief pursuant to 42 U.S.C. § 1983. This alleged violation occurred when the Defendants ordered Bollig to attend a Deniers' Education Program [DEP], which is an educational program for prisoners who have committed sex offenses and have refused treatment. Bollig alleges that he was transferred to a cell separate from the general prison population, lost his prison industries job, and suffered emotional distress because of being forced to attend the DEP.

The Defendants have answered and denied liability. Bollig's request for a temporary injunction was denied and, after a period for discovery, the Defendants moved for summary judgment on the grounds that there are no material facts in dispute and that they are entitled to judgment as a matter of law. See Federal Rule of Civil Procedure 56. Despite being notified of his obligation to respond, Bollig has failed to respond to the motion and his time in which to file a response has now passed, so his right to respond is deemed waived. See Local Rule 6, § 6.02.

### I. FINDINGS OF FACT

The Defendants have submitted proposed findings of fact in support of their motion. See Defendants' Proposed Findings of Fact and Conclusions of Law at 1–13. Because the Plaintiff has not responded with affidavits or other evidence showing that any of these proposed facts are in dispute, the court will accept them as uncontroverted. The Defendants state that:

1. Plaintiff, Richard J. Bollig, is an inmate who was incarcerated at the Oshkosh Correctional Institution ("OSCI") during the times relevant to his complaint.

2. Defendant Patrick J. Fiedler was the secretary of the Wisconsin Department of Corrections until November 1993. Fiedler was succeeded in office by Michael Sullivan.

3. Defendant Donald Gudmanson is the Warden of OSCI.

4. Defendant Karl Brekke is the Director of the Southwest Center at OSCI.

5. Defendant Dr. Margaret Alexander is a Psychologist Supervisor I at OSCI.

6. Defendant Leslie Steckbauer was a social worker at OSCI until November 30, 1992. Defendant Steckbauer is currently a Probation/Parole Agent for the Department of Corrections.

7. Defendant Michael Zeimet is a social worker at OSCI.

8. Defendant David Rutter is the Employee Assistance Coordinator for the Wisconsin Department of Corrections. At the times relevant to this complaint, defendant Rutter was the Open Center Director at OSCI.

9. Defendant Jose Rodriguez was at the times relevant to this lawsuit the Program Review coordinator at OSCI.

10. Upon their entry into the prison system, inmates are placed at the Dodge Correctional Institution for Assessment and

---

**1.** Although Bollig does not state whether he is suing the Defendants in their personal or official capacities, the court will assume that he is suing them in both capacities because he is seeking injunctive and monetary relief. For purposes of an official capacity claim against former Secretary of the Wisconsin Department of Corrections Patrick Fiedler, the present secretary, Michael Sullivan, is substituted. See Federal Rule of Civil Procedure 25(d).

Evaluation ("A & E"). While undergoing the A & E process, inmates are reviewed by medical staff, clinical services staff, and staff who determine the inmate's program and treatment needs.

11. Clinical Services is the Department of Corrections' agency responsible for providing mental health care and treatment services to inmates in the Wisconsin Prison System. The appropriateness of participation in Clinical Services programs is determined by professional staff employed by Clinical Services.

12. A function of the Dodge Assessment and Evaluation Team is the initial classification of inmates and institution placement. The Program Review Committee [PRC] at each institution is then responsible for all follow up reviews of inmates.

13. Plaintiff underwent the A & E process at Dodge Correctional Institution, and was issued his Inmate Classification Summary on December 5, 1991. The Classification Summary states that Bollig's Program Recommendations, in priority order, were:

1. Sex offender treatment
2. DIU (DACC)
3. Chem Depend—support
4. Comm resid confine (CRC)

The committee's overall summary/comments were as follows:

> At age 23 Mr. Bollig is beginning his second period of adult incarceration. He now has an eight year governing term for 2nd degree sexual assault. Maximum custody is warranted given nature of offense.... There is a clinical evaluation on file which recommends SOT [sex offender treatment] and AODA treatment.

14. If, following an inmate's evaluation by a social worker or clinician, a clinical need is established, the Program Review Committee reviews the clinical need of the inmate. If the inmate has a need for treatment but denies that need, the inmate is considered in denial.

15. Defendant Steckbauer was the intake social worker who worked with plaintiff upon his arrival at OSCI in July 1992. On August 3, 1992, Steckbauer made her summary and appraisal of program review request for plaintiff's initial PRC hearing after his arrival at OSCI. The summary stated:

> Mr. Bollig was transferred from GBCI on 7/21/92. He states he will attend AA to meed CDSG [chemical dependency support group] need. He is interested in DIU when available. He has refused SOT [sex offender treatment] in the past but might be interested in a group for those in denial.... He will seek a job preferably in BSI.

16. In late summer or early fall of 1992, OSCI received orders from the DOC in Madison that it was to expand its population. OSCI decided that additional beds were to be put in the Southwest Cell Hall. Prior to this time, the only inmates housed in the Southwest Cell Hall were those inmates who were participating in the sexual offenders treatment program, known as SOTP.

17. In order for an inmate to participate in SOTP, the inmate had to meet certain criteria. The criteria included a clinical evaluation and an assessment of the inmate, the signing of a waiver of confidentiality and a willingness of the inmate to participate in the program.

18. With the addition of twenty-three more beds in the Southwest Cell Hall, the SOTP program was expanded to include education for sexual offenders. A program called SOTP II, later renamed the Deniers' Program, was developed which was designed to help sexual offenders accept responsibilities for their actions, educate the sexual offender and to motivate the offender to accept treatment. From September 1992 to May 1994 defendant Alexander was in charge of the Deniers' Program at OSCI.

19. The Deniers' Program is a three-month pre-treatment program at OSCI designed for men who minimize or deny their offense and have refused treatment or are not sufficiently motivated to benefit from the Sex Offenders Treatment Program. The Deniers' Program is designed to help sex offenders accept responsibility for their actions, as well as to educate sex offenders to come to grips with the reality of their past actions and to motivate the offender to accept treatment.

20. Criteria which must be met for an inmate to participate in the Deniers' Program include: the inmate must be a sex offender and he must deny he needs treatment. An inmate who meets the criteria for the Deniers' Program cannot refuse if he is assigned to the program.

21. Beginning in August of 1992, after the additional beds were put in the Southwest Cell Hall, defendant Brekke received the names of inmates who met the criteria for assignment in the Deniers' Program from the Program Review Committee upon the inmate's initial review at OSCI.

22. Defendant Steckbauer was assigned as plaintiff's social worker while he was housed in the Open Center at OSCI. In November 1992, defendant Steckbauer spoke with plaintiff regarding his upcoming scheduled program review to be held November 16, 1992. After speaking with plaintiff, Ms. Steckbauer entered the following as my [sic] summary on the PRC form: "This is a scheduled review for Mr. Bollig. He is currently assigned to BSI [Badger State Industries] and requests to continue. I support continued placement and custody. He waives appearance."

23. Defendant Steckbauer left her position as social worker at OSCI on November 30, 1992. After making her recommendation for plaintiff's 11/16/92 PRC hearing, Steckbauer did not make any additional program review recommendations for plaintiff prior to her departure.

24. On November 16, 1992, plaintiff Bollig was seen by the Program Review Committee ("PRC") at OSCI for a regular recall. Defendant Rodriguez was a member of this PRC. The 11/16/92 committee commented:

Mr. Bollig is being reviewed as a regular recall for reason indicated above. Committee had some concerns over Mr. Bollig's involvement in the clinical services for issues relating to his offense. We want to indicate to Mr. Bollig today that it is essential that he address his treatment needs. A referral to clinical services has been made today to screen Mr. Bollig for SOTP II [now call the Deniers' Education Program]. We note that he refuses his involvement in this program and indicates

that "might as well send me out as I will not go to that program." Mr. Bollig will be seen again in six months and he will continue his present custody as well as program assignment.

25. Plaintiff Richard Bollig was one of the individuals who met the criteria for placement in the Deniers' Program.

26. The Deniers' Program appeared an appropriate and efficacious means of motivating plaintiff to accept treatment within the prison system, considering the plaintiff's sentence structure and the resources allocated to Clinical Services programs.

27. If an inmate is referred to the DEP, he is moved to the Southwest Center, where the DEP is administered. As Open Center Director, it was defendant Rutter's job to inform inmates housed in the Open Center that they were being transferred to another unit, and to instruct them to pack their belongings for the move.

28. In early December 1992, defendant Rutter was told that plaintiff was being transferred to the Southwest Center for DEP. Defendant Rutter then told plaintiff to pack his belongings for the move.

29. Inmates who have been referred to the DEP may not refuse the program. They must move to the Southwest Center for the DEP.

30. Defendant Rutter was not involved with the placement of inmates to the DEP while he was the Open Center Director at OSCI. Defendant Rutter did not place plaintiff in the DEP, nor did he refer him to the program.

31. The Southwest Center at OSCI houses only inmates who are participants in the Sex Offender Treatment Program or in the Deniers' Education Program.

32. The Deniers' Education Program is not a treatment program, but instead is a motivational program. It is designed to educate sex offenders to come to grips with the reality of what has happened and to motivate the offender to accept treatment.

33. When an inmate arrives in the Southwest Center, defendant Zeimet generally

meets with the inmate in order to discuss his program needs prior to his program review.

34. After plaintiff was moved to the Southwest Center in December 1992 for participation in the Deniers' Education Program, defendant Zeimet was assigned as plaintiff's social worker.

35. On December 8, 1992, defendant Zeimet completed his summary and appraisal of program review request for plaintiff. Zeimet's summary was as follows:

> Mr. Bollig was transferred to the Southwest Center from the Open center on 12/2/92 for participation in the DEP [Deniers' Education Program]. Richard was working in BSI, this assignment will end on 12/11/92. Richard's new assignment will be ½ DEP, ½ SWWA effective date of PRC. DEP will begin on 12/14/92. Social worker concurs with change [and] recommends medium OSCI/DEP.

36. Defendant Zeimet did not make the decision to place plaintiff in the Deniers' Education Program.

37. Plaintiff was seen by the PRC on December 10, 1992 for his program assignment as a new arrival in the SW Center. Defendant Rodriguez was a member of this PRC.

38. The Program Review Committee comments, recommendations and decisions at the December 10, 1992 PRC hearing were:

> Mr. Bollig is being reviewed for a program change.... During this review Mr. Bollig was informed that he was placed in the DEP program as he has been selected by staff at that program. He will be reassigned to ½ DEP, ½ SWWA. Mr. Bollig [indicated] that he is not interested in participating in DEP and that he prefers to be transferred out of OSCI. He has great reservations about discussing his case in front of a group and that he does not deny his offense [sic]. He indicated that he cannot be forced into treatment. He was informed that DEP is an educational program and it is mandatory here at OSCI for individuals who have been identified to be in need of this program. Obviously Mr. Bollig has been identified by Director Karl Brekke....

39. Inmates who are selected for participation in DEP are placed in the program for ½ of their assignment, and placed either in an educational or other assignment for the other ½ time. Inmates in DEP may not work in industries because those assignments are full time only. Inmates do not have a right to a particular work or school assignment.

40. A Program Review Committee meeting took place on December 10, 1992, to determine plaintiff's programming. The PRC recommended that Bollig be placed in the DEP.

41. Defendant Zeimet was not a member of plaintiff's PRC on December 10, 1992.

42. In March 1993, plaintiff completed the DEP, and an early program review was held on March 25, 1993 to determine plaintiff's program upon his completion of DEP. Defendant Zeimet was no longer plaintiff's social worker in March 1993, and was not plaintiff's social worker again during the time plaintiff was incarcerated at OSCI.

43. Plaintiff completed the Deniers' Education Program and again saw the PRC on March 25, 1993. Defendant Rodriguez was a member of this PRC. The committee's comments, recommendations and decision were as follows:

> Mr. Bollig was reviewed today for reasons indicated above. He has completed DEP. We note clinician from DEP summary data dated 3/22/93 indicating that Mr. Bollig remains in need of SOT [sex offender treatment] but still [is] in denial. He apparently did not participate in DEP as well as he was expected to. We note that he has remaining treatment needs, SOT and he is refusing this. We are going to make the recommendation for RCI as the first choice and second choice is FLCI. Mr. Bollig indicates that he prefers to go to FLCI because he does not get along with blacks....

44. The PRC on 3/25/93 recommended plaintiff be transferred to RCI [Racine Correctional Institution] or FLCI [Fox Lake Correctional Institution] because both institutions afford sex offender treatment programs, which plaintiff still needed.

45. On March 30, 1993, the Department of Corrections Central Office approved the PRC's recommendation, and assigned plaintiff to RCI/FLCI, with a transfer priority of "C". The Central Office Staff made the following comments: "Continues to deny offense and has not completed offense related programming. Trf [transfer] to facilities with SOT should his attitude change."

46. Defendant Rodriguez did not make the decision to refer plaintiff to the DEP, although Rodriguez was a member of the PRC which recommended plaintiff's placement in the program based on the referral and information received by OSCI DEP staff. The PRC's recommendation may be either approved, disapproved, or approved with modification by the Central Office Staff.

47. Defendant Steckbauer did not place plaintiff in the Deniers' Education Program at OSCI, and she was in fact not even employed at OSCI at the time he began the program in December 1992.

48. Defendant Brekke was not a member of the PRC who made the decision to place plaintiff in the Deniers' Program and Bollig was not a member of any of the program review committees who subsequently reviewed plaintiff's placement.

49. Defendant Alexander is not officially or personally involved with the program review system and was not involved in any of plaintiff['s] program reviews. In addition, defendant Alexander did not participate in the decision to place or keep plaintiff in the Deniers' Program at OSCI.

50. Defendant Gudmanson had no knowledge of and had no personal involvement in the placement of plaintiff in the Deniers' Program at OSCI. Gudmanson is also not officially or personally involved with the program review system and he was not involved in any of plaintiff Bollig's program reviews.

51. Defendant Gudmanson did not participate in any way in the decision to place or keep plaintiff in the Deniers' Program at OSCI.

52. Although the secretary of the Department of Corrections has general supervisory authority over DOC operations as provided in the Wisconsin Statutes, the secretary does not supervise the day-to-day operations of individual DOC institutions such as the Oshkosh Correctional Institution, nor does he personally monitor the implementation of policies and plans at the various institutions.

53. The DOC secretary does not, in the ordinary course of his duties, participate in decisions concerning inmates' placement in institution programs. The secretary would have had no knowledge of and no personal involvement in the placement of inmates, including plaintiff, in the Deniers' Program at OSCI.

54. To the best of Secretary Sullivan's knowledge, state and federal law, and institutional policies of OSCI have been adhered to by the administration of that institution with respect to plaintiff.

55. To the best of Secretary Sullivan's knowledge, the OSCI institution staff is competent and faithful in the discharge of their duties.

56. The secretary of the DOC is not officially or personally involved with the program review system and the secretary did not become involved in plaintiff's program review.

57. The secretary of the DOC did not participate in any way in the decision to place or keep plaintiff in the Deniers' Program.

## II. *LEGAL STANDARDS FOR SUMMARY JUDGMENT*

Under Federal Rule of Civil Procedure 56(c), parties moving for summary judgment must show that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *McGraw–Edison Company v. Walt Disney Productions,* 787 F.2d 1163, 1167 (7th Cir.1986). If the movants cannot show the absence of any genuine issue of material fact, summary judgment cannot be granted even if, as here, the nonmovant fails to respond. *See Big O Tire Dealers, Inc. v. Big O Ware-*

*house,* 741 F.2d 160, 163 (7th Cir.1984). However, when faced with a properly supported motion for summary judgment, the nonmovant may not avoid judgment by simply resting on his pleadings. If the nonmovant bears the burden of proof on an issue at trial, he must affirmatively demonstrate, by specific showings, that there is a genuine issue of material fact requiring a trial. *See First National Bank of Cicero v. Lewco Securities Corporation,* 860 F.2d 1407, 1411 (7th Cir.1988).

A "genuine" factual issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of any party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510. In this case the substantive law is found in Section 1983 of Title 42 of the United States Code and the case law developed under this civil rights statute.

At the summary judgment stage the judge's function is to determine whether there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See First National Bank of Arizona v. Cities Service Company,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). This inquiry implicates the substantive evidentiary standard of proof that would apply at a trial on the merits which, in this case, is a preponderance of the evidence.

The court must now apply these procedural standards, as well as the substantive law developed under Section 1983, to the undisputed facts of this case.

## III. *DISCUSSION AND DECISION*

### A. LIBERTY INTEREST

■ Bollig does not specify what constitutional right the Defendants are supposed to have violated. The movants, as well as the court, assume that it is his Fourteenth Amendment right to due process. The Seventh Circuit has explained that:

> The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law...." .... A prisoner is "not wholly stripped of constitutional protections when he is imprisoned for crime," *Wolff v. McDonnell,* 418 U.S. 539, 554, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), and, specifically, he does retain some due process rights under the Fourteenth Amendment. *See, e.g., id.* "There is no iron curtain drawn between the Constitution and the prisons of this country." *Id.* Imprisonment, however, necessarily entails that an inmate lose many of the rights ordinary citizens enjoy. *Id.; Hudson v. Palmer,* 468 U.S. 517, 525, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984). Furthermore, prisons must be able to curtail a prisoner's constitutional rights not only to further correctional goals, such as retribution or deterrence, but also to serve institutional objectives, the most basic of which is the internal security of the prisons themselves. *See Pell v. Procunier,* 417 U.S. 817, 828–24, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

*Rowe v. DeBruyn,* 17 F.3d 1047, 1049 (7th Cir.1994), *petition for cert. filed,* 63 U.S.L.W. 3127 (August 1, 1994) (No. 94–249). Identifying the rights protected by the Due Process Clause, the court of appeals went on to say that:

> "[T]he due process clause of the fourteenth amendment is the source of three separate constitutional protections that may serve as the basis of a section 1983 claim against the state and its agents and employees." *Colon v. Schneider,* 899 F.2d 660, 666 (7th Cir.1990).

> First, the Clause incorporates specific protections defined in the Bill of Rights. ...Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, [337–38, 106 S.Ct. 662, 677–78, 88 L.Ed.2d 662

(1986) (Stevens, J., concurring)]. As to these two types of claims, the constitutional violation actionable under §. 1983 is complete when the wrongful action is taken.... The Due Process Clause also encompasses a third type of protection, a guarantee of fair procedure. A § 1983 action may be brought for a violation of procedural due process, but ... [i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law....* [*Id.* ] The constitutional violation actionable under § 1983 is not complete unless and until the State fails to provide due process.

*Colon,* 899 F.2d at 666 (citing *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)).

*Rowe v. DeBruyn,* 17 F.3d at 1050. Whether Bollig is alleging a denial of procedural or substantive due process, he cannot succeed on his claim unless he can prove that he was deprived of a constitutionally protected property or liberty interest. *See Maust v. Headley,* 959 F.2d 644, 647 (7th Cir.1992). Bollig believes that he has a protected interest in being free from mandatory, involuntary participation in the Deniers' Education Program while he is a prisoner. Thus, the facts alleged implicate a liberty rather than a property interest.

Liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). *See also Colon v. Schneider,* 899 F.2d 660, 666 (7th Cir.1990). Bollig has not pointed to any Wisconsin statute or regulation which confers upon him a right to refuse placement in the DEP. Nevertheless, in the absence of such state laws, a prisoner can rely directly upon the Due Process Clause itself for an analogous liberty interest. *See Felce v. Fiedler,* 974 F.2d 1484, 1487 (7th Cir.1992). But again, Bollig has

not met his burden of demonstrating that the right to refuse to participate in a prison educational program is a right contained in the Bill of Rights and incorporated by the Fourteenth Amendment to apply to the states. The only remaining avenue for Bollig is to show that the Defendants deprived him of a fundamental liberty which has no specific textual basis in the Due Process Clause itself. In general, courts have recognized a fundamental right to be free of forced treatment in a prison setting only when the treatment involves the administration of mind-altering drugs, *see, e.g., Riggins v. Nevada,* —— U.S. ——, ——, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992) (forced administration of antipsychotic drugs during trial[2]), or transfer to a different degree or kind of confinement, *see e.g., Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (transfer of prisoner to mental hospital).

Bollig's situation is distinguishable from these cases. The Deniers' Program is not a treatment program but an educational program, in which sex offenders are encouraged to accept responsibility for their crimes and seek treatment. No drugs or other bodily intrusions or restraints are involved. Bollig makes much of the fact that he was transferred to another section of the Oshkosh prison, thereby losing his priority for a single cell, and that he had to quit working in prison industries due to the time requirements of the Deniers' Program. However, it is well-established that, when no greater degree of confinement is implicated, a prisoner has no protectible interest in being in a certain location in a prison or in being free to mingle with the general population. *See, e.g., Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); *Walker v. Sumner,* 14 F.3d 1415, 1419 (9th Cir.1994); *Smith v. Shettle,* 946 F.2d 1250, 1252 (7th Cir.1991); *Pardo v. Hosier,* 946 F.2d 1278, 1281 (7th Cir.1991); *Castaneda v. Henman,* 914 F.2d 981, 983 (7th Cir.1990), *cert. denied,* 498 U.S. 1124, 111 S.Ct. 1085, 112 L.Ed.2d 1190 (1991). Likewise, a prisoner has no protectible interest in a prison job. *See, e.g.,*

---

**2.** *See also Washington v. Harper,* 494 U.S. 210, 227, 110 S.Ct. 1028, 1040, 108 L.Ed.2d 178 (1990) (mentally ill inmate has liberty interest in refusing antipsychotic drugs absent a due process determination that prisoner is dangerous and treatment is in his best interest).

*Wallace v. Robinson*, 940 F.2d 243, 249 (7th Cir.1991) (*en banc*), *cert. denied*, —— U.S. ——, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992); *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984); *Garza v. Miller*, 688 F.2d 480, 486 (7th Cir.1982), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983). Thus, in and of themselves, these changes in circumstances are immaterial to the liberty interest analysis.

The material issue is whether forced participation in the Deniers' Education Program subjected Bollig to conditions qualitatively different from the punishment characteristically suffered by a person committed of a crime. In *Vitek v. Jones*, 445 U.S. 480, 482–83, 100 S.Ct. 1254, 1258, 63 L.Ed.2d 552 (1980), the Supreme Court concluded that an escalated degree of confinement in a mental hospital instead of a prison and the stigmatizing effect of being found mentally ill were circumstances which created a liberty interest in being free of such forcible treatment absent notice and an opportunity to be heard. *See Id.* at 482–83, 100 S.Ct. at 1258.

In contrast to *Vitek*, Bollig does not contend that the Deniers' Education Program subjected him to a greater degree of confinement or to a qualitatively different type of confinement. He remained at the Oshkosh Correctional Institution, albeit in a different location. Likewise, he does not claim that the transfer had a stigmatizing effect. Any stigma attached to being labeled a sex offender attached to Bollig when he was convicted (for the second time) of sexual assault. Under these circumstances, the court will not stretch the concept of fundamental liberty to encompass a substantive right to be free of forced participation in a purely educational rehabilitation program while confined in a state prison. Consequently, because Bollig has no protectible liberty interest, the Defendants have not deprived him of due process.[3]

## B. DUE PROCESS

■ Even if Bollig has a limited liberty interest in being free to refuse to participate in the DEP, the undisputed facts show that he has been afforded procedural due process. "The barebones constituents of fair procedure and therefore of due process are (besides jurisdiction) notice and an opportunity to be heard." *Smith v. Shettle*, 946 F.2d 1250, 1254 (7th Cir.1991) (citing *Twining v. New Jersey*, 211 U.S. 78, 110–11, 29 S.Ct. 14, 24–25, 53 L.Ed. 97 (1908)). A full panoply of procedural rights is required for prisoners only as a predicate to disciplinary confinement. *See Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983).

---

**3.** In ruling that Bollig has no protectible liberty interest in being free from participating in the DEP, this court disagrees with the holding in *Sundby v. Fiedler*, 827 F.Supp. 580 (W.D.Wis. 1993). In that case, the court ruled that Gary Sundby, a similarly situated inmate at the Oshkosh Correctional Institution, had a limited liberty interest in being free to refuse attending the DEP. *See Id.* at 583. In reaching that conclusion, the court did not analyze the source of the right, but merely cited cases recognizing a due process right to be free from forced administration of psychotropic drugs, *see Washington v. Harper*, 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990); or bodily restraint, *see Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); or medical treatment, *see White v. Napoleon*, 897 F.2d 103 (3d Cir.1990); or transfer to a mental hospital, *see Vitek v. Jones*, 445 U.S. 480, 492–93, 100 S.Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1980).

As discussed above, this court does not find the right claimed by Bollig to be encompassed by those rights previously identified by the Supreme Court and refuses to extend the scope of a prisoner's liberty right to include the right to refuse to participate in an educational rehabilitation program. An inmate does not have the right to dictate the terms of his incarceration. As the Seventh Circuit has explained:

[A] prisoner's liberty interests are significantly restricted by the fact of his incarceration, and ... prison officials must have broad discretion to dictate policies that promote order and safety for inmates and correctional staff. "Running a prison is an inordinately difficult undertaking that requires expertise ... peculiarly within the province of the legislative and executive branches of government.... [S]eparation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 85–86, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).

*Rowe v. DeBruyn*, 17 F.3d 1047, 1049–50 (7th Cir.1994), *petition for cert. filed*, 63 U.S.L.W. 3127 (August 1, 1994) (No. 94–249).

Bollig's situation does not involve discipline. Moreover, he was given notice and an opportunity to be heard. After his initial evaluation before entering the Oshkosh Correctional Institution, he was informed that he had been assigned to the DEP and was given an opportunity to appear before the OSCI Program Review Committee. At first, he waived his appearance, but then he did appear and stated that he refused to take part in the program. *See* Findings of Fact, *supra*, at ¶¶ 22 & 24. Nevertheless, he was transferred within the Oshkosh prison to the Southwest Center where only those in sex offender programs were housed. Bollig then received another hearing before the Program Review Committee where he testified that he did not deny his crime, but refused to accept treatment. *See Id.* at ¶ 38. Based upon these undisputed facts, the court concludes that Bollig's Program Review Committee hearings met the minimum constitutional procedural due process requirements.

In any event, procedural due process does not appear to be at issue in this case because Bollig has not explicitly challenged the fundamental fairness of the state's procedures. Instead, he indicates that the state should not be able to place him in the DEP against his will regardless of whether he receives prior notice and a hearing. Such a claim is most properly characterized as a substantive due process claim.

When substantive due process is at issue, "[t]he question is not simply whether a liberty interest has been infringed, but whether the extent or nature of the restraint ... is such as to violate due process. In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982) (quoting *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)).

Where a prison program is alleged to have impinged an inmate's constitutional right, the program is valid if it is reasonably related to legitimate penological interests. *See Hadi v. Horn,* 830 F.2d 779, 783–84 (7th Cir.1987). The Supreme Court has held that a prison inmate retains only those constitutional rights that are not inconsistent with the legitimate penological objectives of the correction system. *See Turner v. Safley,* 482 U.S. 78, 96, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64 (1987).

In this case, even if Bollig does have a limited liberty right, the state's interest in rehabilitation outweighs any burden on Bollig from forced attendance at the nonrestrictive, nonintrusive Deniers' Program.[4] Therefore, the court concludes that the Defendants did not violate any substantive due process right of prisoner Bollig.[5]

### ORDER

For these reasons, the court ORDERS that the "Defendants' Motion for Summary Judgment" (filed July 20, 1994) IS GRANTED.

IT IS FURTHER ORDERED that this action is dismissed upon its merits.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter a final judgment as a separate document. This judgment shall provide that:

This action came on for hearing before the Court, the Honorable Thomas J. Curran, District Judge, presiding, and the issues having been duly heard and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED,

that Plaintiff Richard J. Bollig take nothing and that his action against Defendants Patrick J. Fiedler, Donald Gudmanson, Karl Brekke, Dr. Margaret Alexander, Leslie Steckbauer, Michael Zeimet, David Rutter,

---

**4.** On this issue, the court agrees with the opinion of the court in *Sundby v. Fiedler,* 827 F.Supp. 580 (W.D.Wis.1993).

**5.** Having ruled that Bollig has no protected liberty interest in refusing the DEP, and, in the alternative, that Bollig was not deprived of due process, the court need not address the Defendants' additional arguments that they were not personally involved or that Defendant Jose Rodriguez is entitled to qualified immunity.

Jose Rodriguez and Michael Sullivan is dismissed upon its merits.

Done and Ordered.